Thank you all very much. Very interesting, well-argued case. All right, I'll wait until the court room clears up there. Let's see. Okay. Case number 222874, Ruhmann Consulting v. Symbiont Construction. Good morning, Your Honors. I'm Scott Hallowen of the Hallowen Law Group. I'm counsel for Raumann Consulting and geoengineer Ronald Roos, who's in the courtroom here today. We're here on an appeal in a civil case. It is the appeal of a decision both on a under the anti-claim-splitting doctrine and what is described as the Travis Established Intercorporate Conspiracy Doctrine, and also an appeal of a motion, decision on a motion for summary judgment, that basically applied employment law of Wisconsin and agency law in Wisconsin to what was really a contract claim between two corporations regarding the handling of confidential information, for which I believe that the law that was applied, it simply doesn't apply. Now, Mr. Hallowen, help me out here. Where in the district court did you argue your abuse of process theory of malice? The abuse of process theory of malice, it is in the briefs that were submitted to the district court. It is in, it's, it's the briefing of the the case as it relates to the abuse of process concept, is dealing with the motion to dismiss. And so it would have been the briefing that relates to the decision that was ultimately generated as document number 14 within the 2018 case. There's, it's a difficult set of briefs to do because you got competing briefs going back and forth. If I may, going to the issue of the the motion to dismiss first, if I could take that, Your Honor. You know, on oral argument, I like to try to say something that's above the briefs, basically going up to 35,000 feet, is to just a view of what are the problem with the way this case is handled. And if you read both the decision on summary judgment and the motion to dismiss, there's a misperception that is created that Mr. Roos was paid a wage for assembling confidential information. It is true that while he was an employee of TV John up until the year 2015, he was paid a wage. But that wage was for serving as a geoengineer and project manager. It was not for assembling any sort of confidential information. That's a process that started when Raumann Consulting was put in place. Raumann Consulting had a contract with then TV John that contains the confidentiality provision. That's important because if you read the decision, it sounds as though that wage continued after 2015 and that he was being still paid as a wage employee, even though he was an independent contractor. The only way he was compensated for the work that he did developing the Procore system and for being, for optimizing it, was through commissions. He's not a wage employee. And the court goes on an eight-page discussion of the application of Wisconsin employment law to this situation. When there is a contract, and Article 3 of the contract specifically states, and I quote, nothing contained herein or otherwise shall be construed to create the relationship of an employer or an employee. So the contracting parties themselves said this is not an employment relationship. But yet the court found on the summary judgment decision that the knowledge of Mr. Roos should be imputed under employment law based upon four cases, two from Indiana, that frankly don't involve a contract and simply were not applicable. This is a simple contract. Very few contracts go through the stages of establishing what are the relevant aspects that you need to establish what the nature of the is by name what the confidential information is. In Article 8 it even says that there's substantial money that is involved in the investment and the development of this confidential information. And it even has economic language indicating that this is something of economic significance to the parties. I'm sorry ma'am. Is your position just that the defendants maliciously refused to pay the money they owed under the contract? No. No, it's not. I'm sorry to cut you off. Sorry ma'am. That's not your position. No. And to do, to figure out what the allegations that were actually done, the decision makes it sound as though a couple of people sat around the room in August of 2007. Can we go back to Judge Rovner's question? Sure. Why is that not your position? I guess I'm just trying to make sure that I understand. Sure. There were three claims that were in the, that were raised as counterclaims within the 2017 lawsuit. What were, which were frivolous. One of which related to the refusal to pay commissions. Two of the claims related to other things. They get short shrift in the decision itself but they're dismissed. Mr. Ruth was in the process of actually emigrating to the United States with this family. Steps were taken after the decision to terminate to interfere with his ability to immigrate based upon assertions that he was improperly working in the United States as an engineer at certain times. And Judge Adelman in the 2017 case found that there was no evidence to support any of those three counterclaims. So you know I'm still not getting an answer. I apologize. Is your position just that the defendants maliciously refused to pay the money they owed under the contract? Because to me that would just be a simple breach of contract. Paragraph 144 of the complaint specifically states that the steps were taken not only to avoid commission obligations but also to obtain possession of the confidential information. And the original documents, the original confidential information, was in the job trailers if the 13 projects that continued after he was terminated. So it's broader than just commissions. It's also to get the contract documents. Well why do you need a separate lawsuit instead of just sanctions under Rule 11 or 28 U.S.C. 1927 in the first suit? I'm afraid I'm, you know. Why not seek sanctions for filing a frivolous counterclaim? But that certainly is an option for dealing with this. But the problem is that the actions that were taken were broader. Because Mr. Roos, after he turned over his job trailers, turned over his computers, turned over that information, the intention was to get him to not to compete. There is no non-compete provision that is contained in the independent contractor agreement. Something of which was admitted during discovery was one of the primary purposes of the actions that they wanted. They did not want Mr. Roos to compete because this is a three customer relationship. Menards, Fresh Market, Grover. And he was the person who had the relationships on site and at the So you have the three layers. You have commissions, you have to get the information, and also to get him to stop competing. But how is that information confidential after? How is the information confidential? After he becomes an employee. After he becomes an independent contractor or an employee. And then we can touch on the independent contractor. Well, the information itself is one thing. And that's part of the problem with the decision that I see because he's doing much more than that. And if you go back and you look at the affidavits that were submitted, and they are at specifically exhibit or a DN 109, he does more than just collect paper. He's an engineer. He does engineering evaluations of trusses. He sees where those trusses are sourced. He finds out what steel suppliers around the country may have those on hand and their mileage locations. What he's doing is in 2017 and 2018 when this was happening, this was cutting-edge. You now go to like a Best Buy website and you can source what stores have what things at what price. But at that time that was something that was new. And what he was giving was the access and information to be able to precisely do for steel buildings, which is what these are, the actual components. And he talks about that at length in his affidavit. The steps that he takes with it. So it's not just documents. However, documents are definitely part of it. And when he was an employee, he is getting documents of TV John. It's the exercise of the knowledge. So your answer to the question on confidential information is access to information about components for steel buildings. Is that correct? Yeah, not just that. But yes, that's a good example. He talks about in docket number 109, paragraph 14, the two main things that he was doing was engineering cost codes and job site proximity. For example... Where in the brief, though, does it expand it beyond Judge Brennan's explanation? In the brief before the Court of Appeals or in the brief before the District Court? It's mentioned before the Court of Appeals. The affidavit that I'm referring to is the affidavit that was submitted as part of the summary judgment process. I was referring particularly to what we're looking at here. It is. In fact, there was an argument that was made by opposing counsel in the response that there was no confidential information. It was addressed in the reply. In fact, this is the affidavit that we pointed to. So if you look at that affidavit and you actually look to exhibit 1092, which is discussed in the affidavit, which Judge Edelman described in the case as just a customer list, it's actually described in the affidavit as the input data sheet for Procor. It actually contains the engineering numbers, specific components of that type of vendor's store, and it lists the steel sourcing information and locations and people that you can get that information from. It's detailed information. It is information that is in Mr. Roos's head. It's information that he has gathered as an engineer over the course of his years, and most of the information that was put into Procor was during projects that he served as an engineer and project manager during the course of the independent contractor agreement. Mr. Hallowen, let's say in 2015, Symbiont wanted to bid on a Kroger store, but it had no idea which subcontractors are available to work in the region. Roos knew from a prior T.V. John project that ABC Plumbing was nearby and did good work, so he says, use them, okay? Symbiont agrees, won the bid, wins the bid, and hires ABC Plumbing for the Kroger store. Okay, then we come to 2018, and in 2018, Symbiont bids on a new store in the area and decides to use ABC Plumbing. Again, is it your position that Symbiont's knowledge that ABC Plumbing exists is Roos's confidential information and that Symbiont has misused that information? Is that your argument? No, and in fact, I think that's what the problem with the decision is, is that it takes the concept of optimization, which is now being done with algorithms and very common, and it's a very common emerging industry, and it makes it sound like it's just calling the local plumber, when this is so much more than that. The information that Mr. Roos may have used the plumber, ABC Plumbing, is something that anyone can look in a phone book and see ABC Plumbing might have something in Indiana where they're doing a store. Mr. Roos is doing a nationwide business. He needs to know what specific HVA components that are only compatible with a Kroger Fresh Market store are available, who supplies them, where they are, and where they may be on stock. And how hard would that be to find out? Very hard. First of all, Symbiont wasn't even at the time qualified to be able to bid on a Kroger store. You have to get pre-qualified, but there are a lot of engineering elements to 50 and 60,000 square foot structures, and it's something where, if you're an engineer and you're just looking at this bidding cold, it could take weeks and weeks and weeks to be able to assemble that information, make telephone calls, where he can do it within a couple of days. And he can then use that information to source and obtain information cheaper. There's a reason why we discovered, after the termination of this agreement, that Symbiont Engineering used this product over 300 projects. And that is because it was cutting-edge at the time to be able to do that. And it is so much more than customer lists. And to leave the law as though this is just simply a piece of paper with a customer list with a name ignores the concept of what optimization and Google algorithms and the use of programs like Procore are all about. They're just, they're very different. If I may, I'd like to just point out two other things. One, there is a reference relating to the court of appeal, or sorry, to the district court's use of the inter-corporate conspiracy doctrine, the Travis case. This relates to the motion to dismiss. Please don't leave Wisconsin with that finding. I'm a lawyer who's been doing conspiracy cases for 34 years. The Travis case is based upon a federal conspiracy statute, 42 U.S.C. section 185.3. It uses the language, if two or more persons conspire to defer by force, intimidation, or threat, to keep people from attending court. That's the basis of this decision. Wisconsin statute 134.01 has very different language. And no Wisconsin court has ever applied this corporate conspiracy doctrine, where if you have a bunch of directors sitting down and talking about something, that that somehow has meaning. The Wisconsin statute actually uses the words, any two or more persons who shall combine, associate, agree, mutually undertake, or concert together, willfully or maliciously, by any means whatsoever. It has baked into the language the concept that people might combine. Mr. Howland, you are way over your time. I am going to give you a couple of minutes to rebuttal, but I think, you know, you better wrap up. Okay, I will then. I will stop. Thank you, Your Honor, for hearing me. Thank you very much. Thank you for the time. All right. Hello. Good morning. Good morning, and may it please the court. My name is Kristy Carino, and I represent the appellees in this action. I'd first like to address the question that Judge Rovner asked my opponent at the very beginning with regard to, you know, where in the district court did the plaintiffs here argue about the abusive process theory of malice, and the answer is that they did not. If you search the complaint for the word counterclaim, it appears in one complaint paragraph. That's paragraph 79, and in addressing the arguments and the complaint that, or the allegations specific to the conspiracy to injure business case, the paragraph relating to malice is pretty fulsome, and nowhere in that paragraph does it address the word counterclaim, does it talk about the counterclaim, or does it talk about willful misconduct. Instead, willful misconduct itself is talked in about in count nine of the complaint, which has to do with promissory and equitable estoppel. So in a 217 paragraph long complaint, I think that it is reasonable to read the complaint as it stands, and the allegations with regard to certain counts as they stand. So it was not argued in our opinion, and I would like to point out that on reply, plaintiffs appellants did not address our arguments in our response brief as to the, as to how the claim was actually pled, and why that should be barred by the claim splitting doctrine. So it's waived as far as you're concerned? As far as we're concerned, it's waived, and that is addressed in our response brief. Right. And even if it's not waived, Your Honor, we would say that the factual predicate there is alleging that Symbiont filed its counterclaim as a means to an end of not paying commissions, and ultimately the court, in its decision on the motion to dismiss, dismissed the conspiracy to injure business claim under the claim splitting doctrine because it had to do with the non-payment of commissions. So here, that means the means to the end is the exact, or the end is the exact same regardless of the means, and so the district court's claim splitting doctrine would still apply. You know, why has trial taken so long in the first case? Isn't it a bit unusual that we're still talking about claim splitting, you know, and not raise judicata almost six years later? It is a bit unusual, Your Honor, and the reason for that is, is the way that the contract was structured, the any projects for Kroger, Menards, or the Fresh Market that were bid on and entered into within the two years post-termination, not when those projects were complete. So the projects were not complete, and they were not complete from an accounting perspective to determine the commissions until earlier in, at the end of 2021, or the, excuse me, the end of 2022 or the So it is coming to a head, Your Honor, but it is a very fact-specific reason with regard to how everything has played out in the underlying case. We did, early on, Symbiont did request that the case be stayed until all projects were completed so that the commissions, which are at issue in the first case, could be calculated and discovery could take place all at once. However, the plaintiffs' clients did not want to do that in the first case. So . . . I'm sorry. Go ahead, Judge Rovner. I'll do it quickly. So in other words, I take it all that's left is just the amount of damages under the contractual formulas? That is the main issue that's left. There are some issues as to whether Symbiont owes certain reimbursement funds and then the amount that it would owe. So very small minor issues of liability, but with regard to the main issue, which is commissions, correct. It is just the amount of commissions that are owed. And it would be two invoices, both less than $20,000. Is that correct? I believe they are. I believe it might be three invoices, Your Honor, but they all are less than $20,000, I believe. And then there's also an account for breach of employment contract. That's also would be tried in August. Correct, yes. And that was for an allegation related to overhead that was charged to the projects and plaintiff's allegation that that was improperly charged. Judge Bonet, do you also have . . . That was the question. That was the question. Thank you. Great. Yes, no problem. Can we take a look at the confidential information? Yes, absolutely. And what would your position be regarding the information Mr. Roussacombe, I guess, accumulated before December of 2011? So under the district court's holding, that information could be considered confidential information. However, the problem that we have is that the appellant never made any showing and never met its burden of production in the court. So we are really left kind of hanging as to whether, A, any of that information does exist, B, the nature of it, and whether it would be considered confidential under the terms of the independent contractor agreement, and, you know, C, its creation date and the circumstances under which it was created. In the record in our briefing at the court below, we did point out that some of the information that appellant contended was his confidential information actually had a header of a different previous employer of his on the paperwork. So we would argue that the same agency theories that apply to our client would apply to that information as well. So even if it were created prior to his employment with TV John or Symbiont, you know, it was created with regard to his employment with another general contractor as well. So that's where we're really left unsure and, you know, at summary judgment. And on the record, the plaintiff, you know, needs to put up that information, especially with regard to a confidentiality case, and really needs to convey what the confidential information is that, you know, he is seeking to protect, which we would argue even outside of the ruling on agency, they have not met their burden in doing. Confidential information has been a moving target throughout the course of this case. The history of that is not new to the court. I will also add that this is really the first that we're hearing about a Google algorithm with regard to Procor or, you know, the mentality or, you know, putting everything together. I don't really see how that is properly before the court. I would also just like to correct, and I believe that this is in one of Symbiont's responses to plaintiff's post, findings of fact on the briefing on summary judgments, that Mr. Roos is not an engineer. We specifically asked these questions at his deposition. He does not hold any engineering certificates. So to say then that, you know, his major role while an employee at TV John was to do engineering work is just, I don't think, before the court, and I don't think is the case. If you do look at the letter of employment between Mr. Roos and TV John, which appears at a few places in the record, it was attached to the original complaint. Mr. Roos was hired as the vice president of estimating project controls and major projects, and then in paragraph two it says, this is really the only description of his job, but it's expected that you would be willing to work with BJ's existing clients or public work that may be of interest. So it really goes to the fact that he was hired to undertake this bidding work, and then, you know, that's underscored by the fact that that was the work he was doing under the independent contractor agreement. I believe that it's in the record that Mr. Roos admits that nothing really changed with regard to his job in between the employment agreement and the independent contractor agreement as it came to billing, I'm sorry, bidding projects. If Mr. Roos had quit instead of entering the independent contractor agreement in 2015, would Symbion have any independent records of which subcontractors it had used on projects that Roos had managed? It would because all of the information with regard to subcontractors and their pricing and what they bid on for certain projects, if those projects were awarded, it would be on the project contract, and the contract documents were some of the many documents that were uploaded into Procore. This idea of a source spreadsheet, you know, whether or not that exists, we can't say, but the fact of the matter is that all of the same information that was on the source spreadsheets would also be in the contracts themselves, and it's undisputed that those are Symbion's documents or T.V. John's documents. They are the general contractor. They are the party entering into not only the contract with the client, like the Kroger's and the Fresh Markets, but also with the subcontractors themselves. But I would also argue, Your Honor, that there's nothing in the employment agreement that talks about confidential information. So even if we say that this information is confidential generally, or could be deemed confidential generally, there were no contractual obligations or provisions with regard to that information. I would just like to briefly address as well on the summary judgment motion, the standard of review. Here, the clear error standard should apply. You know, Mr. Rusin and Rauman argue that the clear error standard shouldn't apply because the court was not engaged in the characterization of undisputed facts. While there are certainly disputed facts in this case, none of the material facts that the court used for the basis of its decision are disputed. So the material facts that serve as the basis for the court's decision that the information that is contended to be confidential information was developed during the course of a... I'm sorry, Your Honor. During the course of employment is that the court found that Mr. Rusin was an employee of TV John, the time period and scope of that employment, that Rusin then continued to do the same type of work for Symbiont through Rauman, the time period and scope of that work, and that Rusin and Rauman collected information for their database of information during the employment and the term of the independent contractor agreement. The court then delved into those facts and made a determination or a characterization of those facts to determine that an agency relationship existed and that anything developed during the course of the employment or during the independent contractor agreement was known to TV John or Symbiont. And that is very, very similar to the determinations in Slotsky, where the determination there was whether an enterprise is a trade or business. And the court found that even though that is often a factual issue, delaying judgment does not make sense in a case in which the only factual issue is one of a characterization and the opponent of summary judgment claims no right to a jury trial. In that scenario, both the record and the fact finder are the same in the summary judgment proceeding as they would be at trial. There's no more evidence to put in and no different trier of fact to evaluate it. And that's a quote from actually from the McDougall case, which is quoting Slotsky. And we think that's the exact same type of issue here. The court made a determination of agency. And so therefore, the clear air standard should apply. I think I've covered everything else I have, unless there are any further questions. I'll see my time. No, thank you very much. Thank you. Okay. Thank you, Your Honor, for the generous additional two minutes. If I may quickly, the statement was made that malicious is not pled other than a single paragraph of the complaint. That is correct. It is malicious is in one paragraph, but the sixth cause of action, that is the conspiracy cause of action itself, maliciously exists specifically in paragraphs 144 and 150. That statement was just simply wrong. Also, paragraph 144, the statement was made that there's no reference to conspiracy for anything other than commissions. But in paragraph 144, it specifically pled that the conspiracy, the malice was exercised also with respect to the attempt to obtain the confidential information. So they were both pled. That statement was incorrect. And since this was a motion to dismiss, the issue of confidential information, which the court concedes in the motion to dismiss, is something that should be going forward within the case at that time. It is something that should have gone forward because it was pled within paragraph 144. With respect to the court's question as to what remains before the state, the district court in the 2017 case, it is correct. Three questions, commissions, invoices, and issues relating to the employment contract. I'm sorry, in paragraph 144, the injury to business conspiracy? Yes. The defendants acted together maliciously and intentionally to induce? Yes. Is that where you're directing us to? Yes, it is. And it continues on in the fifth sentence. It says, the intention was to steal Mr. Rouse's and Rauman's Consulting's customers and confidential information without making payments. So confidential information was specifically referenced. What remains before the 2017 case? Commissions? Commissions, the three invoices, and the employment contract were still here today. These were monthly commissions that were supposed to be paid. No commission has been paid since 2017. The position has been of of this last year, and it's part of the frustration of this. It's not sitting out there languishing other than the reason that TB John is still attempting to avoid paying commission. So they didn't restart in April? They didn't restart. Even after the motion to dismiss was decided and it was determined that there was no justification for withholding based on those grounds, they still have not paid the commissions. They did deposit money after a year in court for what they calculated to be the amount, but they've never justified why it is that that's being withheld. They've been trying to strangle it, and it's a small company, and it's been tough. Thank you for the additional two minutes, Your Honor. Thank you very much, Mr. Hallowen, and thank you, Ms. Karina. No case will be taken under advisement.